**UNITED STATES of America,**
**Appellee,**

v.

**Eliot S. SASH, Defendant–Appellant.**

**Docket No. 04–0499–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 7, 2004.

Decided: Jan. 26, 2005.

David S. Hammer, New York, NY, for Defendant–Appellant.

Harry A. Chernoff, Assistant United States Attorney (Adam B. Siegel, Assistant United States Attorney; David N. Kelly, United States Attorney for the Southern District of New York, on the brief), New York, NY, for Appellee.

Before: WALKER, Chief Judge,
MINER and CABRANES, Circuit Judges.

MINER, Circuit Judge.

Defendant-appellant, Eliot S. Sash ("Sash"), appeals from a judgment of conviction and sentence entered in the United States District Court for the Southern District of New York (Casey, *J.*) on January 23, 2004, following his guilty plea. Sash pled guilty to two felony counts: (i) possession of fifteen or more counterfeit UPC bar codes for the purpose of fraud, in violation of 18 U.S.C. § 1029(a)(3), (b)(1), (c)(1)(A)(i); and (ii) unlawful production of identification documents "of a type intended and commonly accepted for the purpose of identifying an individual as an officer of the New York City Police Department," in violation of 18 U.S.C. § 1028(a)(1), (b)(1)(B). The District Court sentenced Sash to a twenty-seven-month term of imprisonment. In reaching the sentence imposed, the court applied a two-level sentencing enhancement, pursuant to section 2B1.1(b)(9)(C)(ii) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"),[1] based upon the court's determination that Sash possessed five or more means of identification that were produced unlawfully from another means of identification. The District Court also imposed an eight-year term of supervised release and ordered restitution in the amount of $2,000 and a special assessment of $200.

On appeal, Sash challenges the two-level sentencing enhancement and the term of supervised release. For the reasons that follow, we agree with the District Court's imposition of the two-level sentencing enhancement. We conclude, however, in accordance with the Government's concession, that the District Court erred

---

1. References herein are to the November 2001 Guidelines and Guideline Manual provisions applicable to Sash at the time of his sentencing. On November 1, 2004, U.S.S.G. § 2B1.1(b)(9)(C) was moved to § 2B1.1(b)(10)(C). As a general matter, a court should employ "the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a).

in imposing supervised release for a term of eight years.

## BACKGROUND

On September 4, 2002, a search warrant was executed at the home of defendant-appellant, revealing thousands of federal, state, and local law-enforcement identification documents and badges, along with the tools and components necessary to fabricate such items. A number of New York City Police Department ("NYPD") badges were seized in the course of the search. These badges bore actual, unique numbers assigned by the NYPD to individual officers and appeared to be authentic. However, the NYPD never authorized Sash or anyone else to fabricate the badges that were discovered in the search. A twenty-one-count indictment (the "Indictment") was returned against Sash on November 27, 2002, charging him in various counts with: producing, and unlawfully possessing with the intent to transfer, hundreds of NYPD identification cards and badges; selling counterfeit badges through the mail to an individual in Kansas; and making false statements to the United States Customs Service in order to secure the release of hundreds of badge components shipped from Taiwan.

While free on bail pending trial on the Indictment, Sash was arrested in New Jersey on December 30, 2002. At the time of his arrest, he was found to possess counterfeit UPC bar codes for K–Mart stores. Sash's arrest of December 30 resulted in the revocation of his bail on January 2, 2003. On February 26, 2003, a twenty-four-count superseding indictment (the "Superseding Indictment") was returned, adding charges of access-device fraud based on Sash's fraudulent use of K–Mart UPC bar codes to return digital videodiscs for more money than their sale prices, in violation of 18 U.S.C. § 1029(a)(1), (a)(2), and (a)(5), (b)(1) and (b)(2).

After the parties had commenced plea negotiations, Sash waived prosecution by indictment and consented that "the proceeding ... be by information instead of by indictment." On June 26, 2003, a superseding information (the "Superseding Information") was filed, charging Sash in count one ("Count One") with "unlawfully, willfully, knowingly and without lawful authority ... transferr[ing] and transport[ing], in the mail and in and affecting interstate and foreign commerce, numerous means of identification of another person with the intent to commit and to aid and abet unlawful activity that ... violat[ed] Federal law, to wit, [Sash] transferred counterfeit police badges to individuals whose receipt, possession, transfer and use of the badges violated Federal laws, and, as a result, [Sash] obtained more than $1,000 during a one-year period," in violation of 18 U.S.C. §§ 1028(a)(7), (b)(1)(D), (c)(3)(A), (c)(3)(B), and 716. Count Two ("Count Two") of the Superseding Information charged Sash with unlawfully possessing "fifteen and more counterfeit access devices, to wit, [Sash] possessed numerous counterfeit UPC bar codes for the purpose of defrauding K–Mart stores," in violation of 18 U.S.C. § 1029(a)(3), (b)(1), and (c)(1)(A)(i).

On June 26, 2003, Sash attempted to plead guilty to both counts in the Superseding Information. In Sash's plea allocution, he stated:

My main business was making duplicate police badges for police officers. I actually had [sixty] percent of the NYPD police supply stores as my customers.

... I do accept [the prosecutor's] explanation ... that ... my business activity in providing the police supply stores and directly to police officers,

since it is against department policy for them to have [duplicate badges], violated the statute . . . .

Sash also explained that he sold police badges to collectors, in addition to many television shows and movie production companies:

> I did sell two badges . . . to their undercover . . . who is a retired State of Kansas sheriff. But he represented himself to me as a collector. The first badge he got was a movie prop from the movie Shaft. The second was a New York City detective badge with a specific number that he requested on it which was for his collection which is allowed, the sale of that. And the transportation interstate is allowed as one of the defenses under [18 U.S.C. § ] 716, however, I have to agree to [the prosecutor's] explanation that the manufacture was the unlawful activity.

Sash continued to explain during his plea allocution that he made "three or four thousand badges during [the year]" described in the Superseding Information ("2001 through in or about 2002"). Sash also admitted to having received more than $1,000 in proceeds from the manufacture and sale of police badges in interstate commerce during the at-issue time period. During his plea allocution, Sash also pled guilty to Count Two of the Superseding Information, explaining that he "took double packs of DVDs, split them apart, put a fake UPC sticker on one and returned it for the value of a double pack, so getting the price of the value for one as two." Sash stated that he engaged in this conduct at a "Kmart" store during the period referenced in Count Two—May 6, 2002 through January 16, 2003—and that he

possessed "[m]ore than 15" counterfeit access devices.

Following Sash's plea allocution, the Government determined that it could not recommend that the District Judge accept Sash's plea of guilty to Count One of the Superseding Information, due to certain equivocations in Sash's plea allocution of June 26. Following a conference with the court on August 8, 2003, at which time Sash discharged his counsel, Sash appeared with new counsel before Magistrate Judge Ronald L. Ellis on September 30, 2003 to plead guilty to Count Two of the Superseding Indictment.[2]

Sash's allocution on September 30, 2003, included the statement that he

> unlawfully, willfully and knowingly did produce duplicate police badges . . . knowing that such police badges were produced without lawful authority. To wit, I produced hundreds of duplicate police badges of a type intended and commonly accepted for the purpose of identifying an individual as an officer of the [NYPD], and I transferred these badges to New York City police officers, detectives, sergeants and lieutenants. The parts for making these duplicate badges were manufactured by a factory for me in Taiwan and shipped to me through the U.S. mail. And they were produced without the authority of the New York City police commissioner.

Sash also admitted that he sold badges through the mail to persons who were not police officers. On October 20, 2003, the District Judge accepted Sash's pleas to Count Two of the Superseding Information and to Count Two of the Superseding Indictment.

---

**2.** It appears that Sash's plea to Count Two of the Superseding Indictment rather than to Count One of the Superseding Information was a means devised by the Government, and

deemed acceptable by the District Court, for resolving certain issues relating to Sash's plea allocution equivocations.

The United States Probation Office determined that Sash's base offense level was 12, which included an upward departure, pursuant to U.S.S.G. § 2B1.1(b)(9)(C)(ii), because "the offense involved ... the possession of [five] or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification," including five or more means of identification of actual individuals. Sash's offense level was increased to 15 because he committed his crime while on pretrial release. After applying the grouping rules of § 3D1.1 et seq., and imposing a three-level downward departure for Sash's acceptance of responsibility, the Probation Office determined that Sash's total offense level was 14. With a criminal history category of III and total offense level of 14, Sash faced a Guidelines range of twenty to twenty-seven months' imprisonment. The Probation Office recommended a sentence of imprisonment of twenty-seven months plus an upward departure based upon Sash's under-represented criminal history.

Among other things, Sash objected to the application of the sentencing enhancement under § 2B1.1(b)(9)(C)(ii) for possession of multiple identifications (the "Enhancement"). By letter dated October 20, 2003, Sash's counsel argued, inter alia, that the Enhancement was limited to crimes of identity theft and that identity theft was an element required for application of the Enhancement. Sash argued that he had not committed identity theft, but rather, that he had produced *duplicate* badges for use by policemen who had wanted a back-up badge, who had themselves placed the order, and who themselves had provided the "means of identification." Specifically, Sash argued that "five or more means of identifications [sic] were not produced from other identification devices. Their production was the result of orders placed with [him] by and received from [the][p]o-lice [o]fficers. The badges that [Sash] produced were not produced from, or obtained by the use of, another means of identification." Sash claimed that the Enhancement "was designed to punish a person who obtains [an] identifying number by some inappropriate means and then uses that information to create another means of identification without authorization."

Finally, Sash argued that the background commentary under section 2B1.1(b)(9)(C)(ii) of the Guidelines reveals the Congressional intent behind the Enhancement and suggests that the Enhancement was aimed at punishing "affirmative identity theft" and "breeding." *See* U.S.S.G. § 2B1.1, cmt. background ("[A]ffirmative identity theft" and "breeding" occur when "a defendant uses another individual's name, social security number, or some other form of identification ... to 'breed' (i.e., produce or obtain) new or additional forms of identification. Because 18 U.S.C. § 1082(d) broadly defines 'means of identification,' the new or additional forms of identification can include items such as a driver's license, a credit card, or a bank loan.").

By letter dated October 31, 2003, the Government stated that "Sash's conduct clearly falls within [the Enhancement] because ... it included the manufacture, of not just five, but thousands of counterfeit police badges, in many cases using identification numbers provided by actual individuals (police officers) so that the counterfeits could be made.... [O]ne means of identification—the officer's shield number—made possible the production of another means of identification—the police badge, which is itself a means of identification because it uses an assigned badge number in conjunction with 'other information,' namely[,] the identifying marks of an NYPD badge, to identify a specific individual."

The Government explained in its October 31 letter that even if the Enhancement required the possession of means of identification unauthorized by the rightful owners of the identification devices, Sash still qualified for the Enhancement because he had "placed for sale over the Internet to the general public police badges that contained the assigned shield numbers of actual NYPD officers, none of whom had supplied Sash with those numbers." The Government further noted that Sash had produced a custom-made badge for an NYPD informant containing a shield number of an actual NYPD officer, who never gave Sash consent to use that shield number.

Sash, by letter dated December 3, 2003, responded that he had not sold police badges to members of the general public over the Internet and that the sales to non-members of the New York City Police Department "were for the sole purpose of being in a collection."

At sentencing, on January 13, 2004, the District Court adopted the factual findings set forth in the PSR and rejected the objections made by Sash. The court adopted both the total offense level of 14 and the criminal history category of III recommended in the PSR. With regard to the Enhancement, the court observed that the Enhancement should be applied where "the offense involves the possession of five or more means of identification that unlawfully were produced from or obtained by the use of another means of identification." Continuing, the District Court stated:

The defendant asserts that the [E]nhancement provision does not apply to the conduct at issue here because the commentary indicates that the provision was designed to address violations of the Identity Theft and Assumption Deterrence Act of 1998.

The Court finds that under the plain language of section 2B1.1(b)(9), the [E]nhancement applies to the conduct at issue in this case. Although the commentary indicates that this provision addresses violations of the Identity Theft and Assumption Deterrence Act of 1998, it does not limit its application to violations of that statute. Therefore, the court applies the [G]uidelines so as to be consistent with both the commentary and the statutory language. Accordingly, the court finds that the probation officer correctly applied the [E]nhancement under section 2B1.1(b)(9) of the [G]uidelines.

Rejecting the Government's request for an upward departure based upon Sash's criminal history, the District Court sentenced Sash to a term of imprisonment of twenty-seven months; imposed an eight-year term of supervised release; and ordered restitution in the amount of $2,000 and a special assessment in the amount of $200. A judgment of conviction and sentence that included the dismissal of all remaining counts in the Superseding Indictment and Superseding Information was entered on January 23, 2004. This timely appeal followed.

## DISCUSSION

I. *Possession of Multiple Identifications Enhancement*

■ We review the factual findings of a district court for its imposition of a sentencing enhancement, pursuant to the Guidelines, for clear error, and we review a district court's legal determinations in regard to the applicability of the enhancement, i.e., whether the facts legally support an enhancement, de novo. 18 U.S.C. § 3742(e); *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir.2003); *see, e.g., United States v. Meskini*, 319 F.3d 88, 91 (2d Cir.2003).

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Ekwunoh*, 12 F.3d 368, 370 (2d Cir.1993) (internal quotation marks omitted). And, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Chalarca*, 95 F.3d 239, 244 (2d Cir.1996) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

Here, section 2B1.1 of the Guidelines sets a base offense level of 6 for Sash's offense. The Enhancement states that "the possession of [five] or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase[s] [the offense level] by [two] levels." U.S.S.G. § 2B1.1(b)(9)(C)(ii).[3] Application note 7(A) of U.S.S.G. § 2B1.1 discusses the application of § 2B1.1(b)(9), specifying that: " 'Means of identification' has the meaning given that the term in 18 U.S.C. § 1028(d)(3), except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 2B1.1, cmt. n.7(A). Section 1028(d)(7)(A), which was formerly codified at section 1028(d)(4), states that a "means of identification" includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . official State or government issued . . . identification number." 18 U.S.C. § 1028(d)(7)(A).

Application note 7(D) further states:

Subsection (b)(9)(C)(ii) applies in any case in which the offense involved the possession of [five] or more means of identification that unlawfully were produced or obtained, regardless of the number of individuals in whose name (or other identifying information) the means of identification were so produced or so obtained.

U.S.S.G. § 2B1.1, cmt. n.7(D).

Sash's argument rests solely on the proposition that portions of the background commentary to U.S.S.G. § 2B1.1 suggest that identity theft, as discussed in the background commentary, must be an element of the crime of conviction if the enhancement provided in section 2B1.1(b)(9)(C)(ii) is to be applied. Sash admits to only three actions: (i) making duplicate badges for their original owners; (ii) selling one badge to a confidential informant who pretended he was a collector and requested a specific shield number; and (iii) distributing fake badges for noncriminal purposes (i.e., collecting and filmmaking). Sash claims that only the second action constitutes identity theft. Accordingly, Sash claims that he should not have been sentenced, pursuant to the Enhancement, for five or more instances of identity theft.

The commentary states that "[s]ubsection (b)(9)(C)" "focuses *principally* on an aggravated form of identity theft known as 'affirmative identity theft' or 'breeding,' in

---

**3.** U.S.S.G. § 2B1.1(b)(9) provides, in full, that: "If the offense involved (A) the possession or use of any device-making equipment; (B) the production or trafficking of any unauthorized access device or counterfeit access device; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; or (ii) the possession of [five] or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by [two] levels. If the resulting offense level is less than level 12, increase to level 12."

which a defendant uses another individual's name, social security number, or some other form of identification ... to 'breed' ... new or additional forms of identification." U.S.S.G. § 2B1.1, cmt. background (emphasis added). The commentary continues:

[T]he new or additional forms of identification can include items such as a driver's license, a credit card, or a bank loan.... The minimum offense level accounts for the fact that the means of identification that were "bred" (i.e., produced or obtained) often are within the defendant's exclusive control, making it difficult for the individual victim to detect that the victim's identity has been "stolen."

*Id.*

The Guidelines suggest three categories of purposes that commentaries may serve:

The Commentary that accompanies the [G]uideline sections *may* serve a number of purposes. First, it *may* interpret the [G]uideline or explain how it is to be applied.... Second, the commentary *may* suggest circumstances which, in the view of the Commission, may warrant departure from the [G]uidelines. Such commentary is to be treated as the legal equivalent of a policy statement. Finally, the commentary *may* provide background information, including factors considered in promulgating the [G]uideline or reasons underlying promulgation of the [G]uideline. As with a policy statement, such commentary *may* provide guidance in assessing the reasonableness of any departure from the [G]uidelines.

U.S.S.G. § 1B1.7 (emphases added). We deem the at-issue commentary here to fall within the third category of purposes that commentaries may serve, as the commentary here provides background information regarding the Enhancement.

Sash's argument is unavailing. We need not resort to background commentary interpretations when the language of the Guidelines is plain. In *United States v. Mingo,* 340 F.3d 112 (2d Cir.2003), we explained that when "the language of the Guidelines provision is plain, the plain language controls." 340 F.3d at 114 (citing *United States v. SKW Metals & Alloys, Inc.,* 195 F.3d 83, 90 (2d Cir.1999)); *see also United States v. Demerritt,* 196 F.3d 138, 141 (2d Cir.1999) ("[W]e must give the words used their common meaning, absent a clearly expressed manifestation of contrary intent." (quotation marks and citation omitted)); *United States v. Millar,* 79 F.3d 338, 346 (2d Cir.1996) ("As with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation ...." (internal quotation marks and citation omitted)). When "the wording of the Guideline is subject to but one interpretation, it is unnecessary to consult other sources for interpretive guidance." *Mingo,* 340 F.3d at 115.

We distinguish this case from *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), where the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." 508 U.S. at 38, 113 S.Ct. 1913. It seems to us that *Stinson* can be limited to the first category of commentary—i.e., commentary that "interpret[s] ... or explain[s] how [the Guideline] is to be applied." U.S.S.G. § 1B1.7. The commentary there defined a particular at-issue term ("crime" or "violence"), and, thus, the commentary fell within the first category of commentary. *See Stinson,* 508 U.S. at 39, 113 S.Ct. 1913. In addition, in finding that the commen-

tary was binding, the Court characterized it as "interpretive and explanatory of the Guideline." *Id.* at 42, 113 S.Ct. 1913; *see also id.* at 43, 113 S.Ct. 1913 (referring only to "interpretive or explanatory" commentary as binding).

While *Stinson* itself seems limited to the first category of commentary, courts—including this one—have used its language without distinguishing between categories of commentary. For example, in *United States v. Johnson,* 347 F.3d 412 (2d Cir. 2003), the Court referred to background commentary on the appropriate non-punitive uses of probation as "authoritative." 347 F.3d at 416–17 & 417 n. 3; *see also United States v. Jiles,* 259 F.3d 477, 480 (6th Cir.2001) (reading background commentary as if it had the force ascribed by *Stinson* to interpretive commentary). We hold that *Stinson,* insofar as it establishes the binding nature of commentary, applies only to commentary that is interpretive or explanatory in nature. *Stinson,* therefore, would not render binding the commentary at-issue in this case, which merely provides "background information, including factors considered in promulgating the guideline or reasons underlying promulgation of the guideline." U.S.S.G. § 1B1.7; *see also United States v. Hightower,* 25 F.3d 182, 187 (3d Cir.1994) (stating that commentary that merely provides "background information" on a guideline is not binding).

A Guideline may apply in situations not contemplated by the background commentary to the Guideline. In *United States v. Auguste,* 392 F.3d 1266 (11th Cir. 2004), the Eleventh Circuit examined the applicability of § 2B1.1(b)(9)(C)(i). There, the defendant added her name to that of an American Express cardholder as a secondary card holder. *Id.* at 1267. The appellant-defendant received a card in her name, in addition to accessing five other American Express accounts to make pur-

chases. *Id.* The District Court applied the two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C)(i) because the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *Id.* (internal quotation marks omitted). The Eleventh Circuit noted that "none of the examples in the background commentary to § 2B1.1(b)(9)(C) contemplates a situation where a defendant adds her own name to a victim's existing line of credit as a purported legitimate secondary cardholder. Moreover, there is no case law that addresses this scenario." *Id.* at 1268. (citations omitted). In finding that the application of § 2B1.1(b)(9)(C)(i) was warranted, the court resorted to the plain language of the enhancement provision, without examining the background commentary that Sash cites. Indeed, the court stated that:

> [T]he lack of relevant application notes and caselaw is of no moment. What matters is the plain language of § 2B1.1(b)(9)(C)(i). Under that subsection, a court must apply a two-level enhancement if an offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any means of identification."

*Id.* (emphasis and footnote omitted). The Eleventh Circuit explained that the defendant-appellant unlawfully obtained transferred credit card numbers, the "means of identification," to obtain new credit cards for herself—the "other means of identification." We stand with the Eleventh Circuit in its plain-meaning analytical approach to the analogous provision, § 2B1.1(b)(9)(C)(i), and apply that same analysis to § 2B1.1(b)(9)(C)(ii).

Accordingly, we find that the District Court's application of the plain language of

the Enhancement was appropriate. An officer's badge-and-shield number unquestionably constitutes a unique, government-issued identification, as it identifies an actual, specific officer of the NYPD, and, thus, is a "means of identification." *See* 18 U.S.C. § 1028(d)(4), (7). Hence, the at-issue badges that Sash produced are clearly "means of identification" for purposes of the Enhancement. Despite the fact that Sash may have received permission from various police officers—but not the police commissioner or department—to produce a duplicate badge at the officer's request, Sash was still "unlawfully" producing a "means of identification" from "another means of identification" under the plain meaning of the Enhancement. *See United States v. Melendrez*, 389 F.3d 829, 834 (9th Cir.2004) (noting that an unlawfully produced duplicate means of identification still subjects a defendant to the § 2B1.1(b)(9)(C) enhancement because "there is no requirement that the source ID number and the produced ID [number] be different numbers").

In sum, Sash's production, or in some cases duplication, of identification documents (i.e., police badges) falls within the purview of the plain meaning of the language of the Enhancement, as Sash never received legal permission from the proper authorities in the NYPD to produce or duplicate NYPD badges. Notably, section 190.27 of the New York State Penal Law prohibits the sale of "any part of the [police] uniform which identifies the wearer as a member of a police department, such as the uniform, shield, badge, numbers, or other identifying insignias or emblems."

N.Y. Penal L. § 190.27. Moreover, section 14–108 of the New York City Administrative Code prohibits the unlawful production or possession of tools to reproduce official department identification cards and the sale of police uniforms and badges to unauthorized persons.

Sash admitted to duplicating badges well in excess of "[five] or more" times, U.S.S.G. § 2B1.1(b)(9)(C)(ii), and Sash even admitted that, on various occasions, he produced duplicate police badges without permission. Specifically, Sash admitted that he "willfully and knowingly did produce duplicate police badges which are considered false identification documents under this statute, ... knowing that such police badges were produced without lawful authority," and that he "produced hundreds of duplicate police badges of a type intended and commonly accepted for the purpose of identifying an individual as an officer of the [NYPD]." Clearly, the record and Sash's own admissions require application of the Enhancement, pursuant to its plain language, which is a sufficient basis for the application.[4]

Even assuming we were to resort to the background commentary of the Enhancement for guidance in applying the Enhancement, nothing in the commentary *requires* that identify theft or "breeding" be found in order to apply the Enhancement, as the commentary merely states that the enhancement was "principally"—as opposed to "solely"—aimed at identify theft and "breeding." U.S.S.G. § 2B1.1(b)(9)(C)(i), cmt. background.

---

4. Sash argues that he never admitted to five or more transfers of NYPD badges to non-NYPD officers and that, because he never admitted to selling or transferring five or more NYPD badges, the Enhancement was in violation of the Sixth Amendment, as these facts were not determined by a jury or admit-

ted by Sash. However, even accepting Sash's argument and disregarding the evidence of Sash's Internet transfers and sales to "badge collectors," Sash nonetheless admitted to producing thousands of duplicate, counterfeit NYPD badges, which he did not have lawful permission to do.

We have considered all of defendant's remaining arguments and find them to be without merit.

For the foregoing reasons, the District Court's judgment of conviction and upward departure under the Guidelines is affirmed.

## II. *Supervised Release*

The Government requested that Sash be sentenced to an eight-year term of supervised release, consisting of two consecutive terms, one of five years and one of three years, based on Count Two of the Superseding Indictment and Count Two of the Superseding Information, respectively.

As the two counts to which Sash pled guilty bear maximum sentences of incarceration of fifteen years, *see* 18 U.S.C. §§ 1028(b)(1)(B), 1029(c)(1)(A)(i), each is deemed a Class C felony, pursuant to 18 U.S.C. § 3559(a)(3) ("An offense that is not specifically classified by a letter grade in the section defining it, is classified if the maximum term of imprisonment authorized is ... less than twenty-five years but ten or more years, as a Class C felony.").

■ Because Sash pled guilty to two Class C felonies, the maximum term of supervised release for each of the offenses of conviction is three years. *See* 18 U.S.C. § 3583(b)(2) ("[T]he authorized terms of supervised release are ... for a Class C or Class D felony, not more than three years."). Further, as Sash has multiple terms of supervised release, the terms must run concurrently, pursuant to 18 U.S.C. § 3624(e). Therefore, as the Government concedes, the "total maximum lawful term of supervised release here was three years." The eight-year term of supervised release imposed by the District Court constituted plain error. *See* Fed. R.Crim.P. 52(b); *United States v. Pico*, 966 F.2d 91, 92 (2d Cir.1992) (per curiam)

(citing *United States v. Rodriguez*, 943 F.2d 215, 216–17 (2d Cir.1991)). Accordingly, the District Court's judgment imposing an eight-year term of supervised release must be vacated and the case remanded for resentencing in accordance with this opinion.

## CONCLUSION

For the foregoing reasons, we vacate the sentence imposed by the District Court insofar as it orders an eight-year term of supervised release. We remand for resentencing consistent with this opinion and affirm the District Court's judgment in all other respects.