05-5523-cr
USA v. Leonard (Silver)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: February 19, 2008)            Decided: June 11, 2008)

Docket Nos. 05-5523-cr(L), 06-0080-cr(con), 06-2392-cr(con)
_____

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JAMES M. LEONARD, LAURENCE BOWSKY, VINCENT CAVARRA, ABRAHAM M. DANIELS, ALBERTO FERREIRAS, HOWARD P. GOODMAN, MARY L. GOODMAN, IAN HAHN, ROSEMARIE INGENITO, RICHARD H. JENKINS, KURT E. KRANZ, ANTHONY LIGGIO, PHILIP MANZIONE, WILLIAM NEWSOM, LISA NIKSIC, DONALD F. O'GRADY, FRANK ROSSI, ANTHONY R. STARK, BEVERLY J. TEDDER, ERIC THOM, DANA VALENSKY, KENNETH R. ZOLO,

*Defendants,*

CYNTHIA SILVER,[1] PAUL C. DICKAU, NANCI SILVERSTEIN,

*Defendants-Appellants.*

_____

B e f o r e:      KEARSE, CALABRESI, and KATZMANN, *Circuit Judges.*

_____

---

[1] In an order entered on March 6, 2006, this Court closed the appeal of defendant-appellant Cynthia Silver after she withdrew her appeal.

Appeals from judgments of the United States District Court for the Eastern District of New York (Wexler, *J.*), (1) convicting appellant Dickau of two counts of securities fraud and two counts of conspiracy to commit securities and mail fraud and sentencing him, in principal part, to forty-three months' imprisonment with a restitution order of $499,989.64, and (2) convicting appellant Silverstein of one count of securities fraud and one count of conspiracy to commit securities and mail fraud and sentencing her, in principal part, to six months' imprisonment with a restitution order of $14,940. We **AFFIRM** the convictions, **VACATE** the sentences, and **REMAND** to the district court for resentencing.

————————

FOR APPELLANTS:                    NORMAN TRABULUS, Garden City, N.Y.
                                   *For Paul C. Dickau*

                                   MICHAEL F. BACHNER (Danielle L. Attias, *of counsel*),
                                   Bachner & Associates, P.C., New York, N.Y.
                                   *For Nanci Silverstein*

FOR APPELLEE:                      GEOFFREY R. KAISER (David C. James, *of counsel*), Assistant
                                   United States Attorneys *for* Roslynn R. Mauskopf, United
                                   States Attorney for the Eastern District of New York,
                                   Brooklyn, N.Y.

————————

KATZMANN, Circuit Judge:

Over sixty years ago, the Supreme Court established the test for whether a given financial instrument or transaction constitutes an "investment contract"--and, therefore, a security--for purposes of the federal securities laws. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). We write today to underscore that, in applying the *Howey* factors, courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions to evaluate whether "the reasonable expectation was one of significant investor control." *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 585 (2d Cir. 1982).

Appellants Dickau and Silverstein were two of twenty-five individuals indicted for criminal fraud for their role in marketing investment interests in film companies. Following a

jury trial, they were each convicted of securities fraud and conspiracy to commit securities and mail fraud. On appeal, they challenge their convictions, claiming, *inter alia*, that insufficient evidence supported the determination that the interests at issue were securities and that the district court erred in including a "no ultimate harm" charge in the jury instructions. In addition, they challenge their sentences on the ground that the district court erred in measuring the loss amount as the entire cost of the total shares that defendants sold. We find the various objections to the conviction to be without merit. We agree with appellants, however, that the district court erred in its determination of the loss amount and therefore remand the cases for resentencing.

## BACKGROUND

Appellants Paul C. Dickau and Nanci Silverstein each operated an independent sales office ("ISO") selling interests in companies formed to finance the production and distribution of motion pictures. Dickau's ISO sold interests in Little Giant, LLC, an entity created to produce the film *Carlo's Wake*.[2] Both appellants' ISOs sold interests in Heritage Film Group, LLC, which was established to produce the film *The Amati Girls*. As their names suggest, Little Giant and Heritage are limited liability companies ("LLCs"), and the interests in the companies took the form of investment "units," priced at $10,000 each.

The ISOs solicited investments in Little Giant and Heritage over the phone, calling potential investors to generate interest in the film projects. The film's promoters would then mail potential investors offering materials, including a brochure, operating agreement,

---

[2] *Carlo's Wake* is not to be confused with *Carlito's Way*, the 1993 film starring Al Pacino, Penelope Ann Miller, and Sean Penn and directed by Brian De Palma.

-3-

subscription agreement, risk disclosure sheet, and instruction sheet. If the potential investor decided to participate in the investment, he or she would send the subscription agreement, along with a check, directly to the film's promoters.

When an ISO succeeded in selling an interest in Little Giant or Heritage, it would receive a commission. Dickau's company received a 42% and 45% commission on sales of Little Giant and Heritage units, respectively. Silverstein's company received a 45% commission on sales of Heritage units. The offering memoranda did not reflect these hefty commission rates. Read liberally, the offering materials might be said to indicate that no more than 20% of the unit price would go toward sales commissions.[3]

Dickau's company sold a combined total of $520,000 worth of Little Giant and Heritage units and retained $210,376 in commissions. Silverstein's company sold $90,000 in interests in Heritage, pocketing $32,939 in commissions.

---

[3] For example, the Little Giant "Risk Disclosure" sheet provided:

 Initial Capital Contributions will be allocated substantially as follows:

| | |
|---|---|
| Film Production (per contract with Triple Axle Productions, Inc.): | 44.0% |
| Pre-Production (includes script research, script development, script writing, location research and misc. pre-production expenses): | 25.0% |
| Sales Commissions: | 12.0% |
| Initial Setup/Administration: | 10.0% |
| Sales Office Overhead and Bonuses: | 8.0% |
| Retained by LLC for Operating Expenses: | 1.0% |
| | 100.0% |

(Although this itemization showed only 12% of contributions would be spent on "sales commissions," Dickau argues that total commissions to ISOs were effectively disclosed as 20%--the sum of the "sales commissions" and "sales office overhead and bonuses" lines.) The "Risk Disclosure" sheet for Heritage Film Group listed sales commissions as 15% and sales office overhead and bonuses as 5% of capital contributions.

The government charged Dickau with four counts: one count of conspiracy to commit securities and mail fraud in relation to each of Little Giant and Heritage, *see* 18 U.S.C. § 371, and one count of securities fraud in relation to each of Little Giant and Heritage, *see* 15 U.S.C. §§ 78j, 78ff. The government charged Silverstein with one conspiracy count and one fraud count in relation to Heritage. All counts centered around the failure to disclose accurately the sales commission that the ISOs would be taking on the investment units. Following a trial in the Eastern District of New York, the jury returned a verdict of guilty on all counts against Dickau and Silverstein. Judge Wexler sentenced Dickau to forty-three months' imprisonment and ordered him to pay $499,989.64 in restitution. Judge Wexler sentenced Silverstein to six months' imprisonment, ordering her to pay $14,490 in restitution.

## DISCUSSION

*I. Whether Sufficient Evidence Supported the Finding that the Units Were Securities*

"A defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden." *United States v. Nektalov*, 461 F.3d 309, 317 (2d Cir. 2006). As we consider the challenge, "we must view the evidence, whether direct or circumstantial, in the light most favorable to the government and credit every inference that could have been drawn in its favor." *United States v. Diaz*, 176 F.3d 52, 89 (2d Cir. 1999). We will reject the sufficiency challenge if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative

or deceptive device." 15 U.S.C. § 78j(b). Section 32 of the 1934 Act creates criminal penalties

for willful violations of the provisions of the 1934 Act, including violations of Section 10(b). 15

U.S.C. § 78ff(a). Thus, for the convictions of securities fraud and conspiracy to commit

securities fraud to stand, there must be sufficient record evidence for the jury to have concluded

that the interests in Little Giant and Heritage were "securities" within the meaning of the 1934

Act.[4]

Although federal statutes enumerate many different instruments that fit the definition of

security, the parties agree that the only category that potentially applies to this case is

---

[4] Because the parties agreed to submit the question of whether the units were "securities" to the jury, we do not have occasion to address when, and to what extent, such an issue must be submitted to the jury in a criminal case, a topic our case law has addressed only in other contexts. *See United States v. Thomas*, 54 F.3d 73, 78 (2d Cir. 1995) (noting that 18 U.S.C. § 513 expressly defines securities to include "money order[s],"; that at trial "no issue was raised as to whether or not the[] instruments [in question] were money orders,"; and thus, "the court was not required to pose . . . to the jury" a question as to whether instruments were securities); *United States v. Rogers*, 9 F.3d 1025, 1033 (2d Cir. 1993) ("[I]t may have been proper for the court to determine preliminarily whether or not an item could possibly be a security" for purposes of 18 U.S.C. § 2311, but thereafter the defendant "was entitled to have the judge instruct the jury on what a security is and to let the jury decide whether the items at issue were securities."); *see also Schaafsma v. Morin Vt. Corp.,* 802 F.2d 629, 637 (2d Cir. 1986) (concluding, in a civil case, that when an instrument meets the definition of stock on its face, it is a security as a matter of law and the issue should not have gone to the jury).

"investment contract."[5]  In the seminal case, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the

Supreme Court provided the following definition of investment contract:

> an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298-99.  Appellants suggest that the Little Giant and Heritage units cannot constitute

securities because investors never expected profits "solely from the efforts" of the promoters or

others.

---

[5] Section 3(a)(10) of the 1934 Act defines "security" to mean:

> any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).  Section 2(1) of the Securities Act of 1933 (the "1933 Act") contains a slightly different formulation.  15 U.S.C. § 77b(a)(1).  The Supreme Court has instructed that the definitions of  "security" in the 1934 Act and the 1933 Act "are virtually identical," and the two "will be treated as such in . . . decisions dealing with the scope of the term." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n.1 (1985); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990).

Following the Ninth Circuit's lead, *see SEC v. Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir. 1973), we have held that the word "solely" should not be construed as a literal limitation; rather, we "consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982).[6] Thus, in *Aqua-Sonic* we distinguished between companies that seek the "passive investor" and situations where there is a "reasonable expectation . . . of significant investor control." *Id.* at 585. It is the passive investor "for whose benefit the securities laws were enacted"; where there is a reasonable expectation of significant investor control, "the protection of the 1933 and 1934 Acts would be unnecessary." *Id.*

Our consideration of whether the investors in Little Giant and Heritage viewed the units primarily as a passive investment is complicated by the fact that Little Giant and Heritage were each structured as an LLC--a relatively new, hybrid vehicle that combines elements of the

---

[6] The result in *Glenn W. Turner* has been widely followed. *See SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999); *Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 152-53 (3d Cir. 1997), *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992); *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 n.4 (4th Cir. 1988); *Meyer v. Dans un Jardin, S.A.*, 816 F.2d 533, 535 (10th Cir. 1987), *Goodman v. Epstein*, 582 F.2d 388, 408 n.59 (7th Cir. 1978); *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir. 1983); *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981).
　　We reject the suggestion that the Supreme Court implicitly overruled this long list of case law simply by quoting the passage from *Howey*, reprinted *supra*, in *SEC v. Edwards*, 540 U.S. 389, 393 (2004). In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975), the Court quoted this exact same language while explicitly expressing no view on the question of whether "solely" should be read as a literal limitation. *Id.* at 852 n.16. And the meaning that appellants read into *Edwards* is at odds with the expansive nature of the opinion itself, which emphasizes that "'Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called.' To that end, it enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'" *Edwards*, 540 U.S. at 393 (quoting *Reves*, 494 U.S. at 61 (emphasis in *Reves*)).

traditional corporation with elements of the general partnership while retaining flexibility for federal tax purposes. *See generally* Louis Loss & Joel Seligman, *Securities Regulation* § 3-A-1 (3d ed. 2006). Although "common stock is the quintessence of a security," *Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 693 (1985)), and "[n]ormally, a general partnership interest is not considered a 'security,'" *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir. 1983), because of the sheer diversity of LLCs, membership interests therein resist categorical classification. Thus, an interest in an LLC is the sort of instrument that requires "case-by-case analysis" into the "economic realities" of the underlying transaction, *Reves*, 494 U.S. at 62.

One of the original promoters of Little Giant and Heritage, Russell Finnegan, testified at trial that the LLCs were structured so as to minimize the possibility that the investment units would constitute securities--"to get into . . . the gray areas of the securities law." Indeed, were we to confine ourselves to a review of the organizational documents, we would likely conclude that the interests in Little Giant and Heritage could not constitute securities because the documents would lead us to believe that members were expected to play an active role in the management of the companies. For example, the sheet titled "Summary of Business Opportunity: Heritage Film Group, LLC" explains:

> Each Member is required to participate in the management of the Company retaining one (1) vote for each Unit acquired. Each important decision relating to the business of the Company must be submitted to a vote of the Members.
>      The purchase of interests in the Company is not a passive investment. While specific knowledge and expertise in the day to day operation of a film producing and distributing company is not required, Members should have such knowledge and experience in general business, investment and/or financial affairs as to intelligently exercise their management and voting rights . . . . Further, each

Member is required to participate in the management of the Company by serving on one or more committees established by the Members.

The summary further states that a manager may be chosen to perform certain "ministerial functions," such as keeping books and records, keeping the members informed, and circulating ballots to members, but the members retain the right to replace the manager and appoint his successor upon majority vote. Likewise, the operating agreement for Heritage provides that the "Company shall be managed by the Members . . . . [E]ach Member shall have the right to act for and bind the Company in the ordinary course of its business." Thus, on the face of the documents, Heritage and Little Giant appear to provide for too much investor control to allow the jury to conclude that the units were securities.

In actuality, however, the Little Giant and Heritage members played an extremely passive role in the management and operation of the companies. At trial, members testified that they voted, at most, "a couple of times." Although the organizational documents provided for the formation of a number of committees, only two committees were formed for each of Heritage and Little Giant--a financial committee and a management committee. Of the 250-300 investors in Little Giant, five served on the management committee and seven served on the financial committee. Of the 350-400 investors in Heritage, ten served on the management committee and seven served on the financial committee. Thus, the vast majority of investors in both companies did not actively participate in the venture, exercising almost no control.

Record evidence allowed the jury to conclude that--notwithstanding the language in the organizational documents suggesting otherwise--from the start there could be no "reasonable expectation" of investor control, *Aqua-Sonic Prods. Corp.*, 687 F.2d at 585. Such consideration

of the reality of the transaction is consistent with the Supreme Court's repeated instruction to prize substance over form in our evaluation of what constitutes a security. *See, e.g.*, *Reves*, 494 U.S. at 61 ("In discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation."); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality."); *W.J. Howey Co.*, 328 U.S. at 300 (disregarding "the legal terminology in which . . . contracts are clothed").

For one, under the organizational documents, the members' managerial rights and obligations did not accrue until the LLCs were "fully organized." As promoter James Alex testified, so-called "interim managers" initially held legal control rights, and they decided almost every significant issue prior to the completion of fundraising: "The script, the director, the cast, the crew, scoring of it, editing. The entire picture was pretty well preproduced . . . ." Thus, the jury could reasonably have found the managerial rights contained in the organizational documents were hollow and illusory.

The jury was also entitled to consider the fact that the members appear not to have negotiated any terms of the LLC agreements. Rather, they were presented with the subscription agreements on a take-it-or-leave-it basis. That they played no role in shaping the organizational agreements themselves raises doubts as to whether the members were expected to have significant control over the enterprise.

Moreover, the members had no particular experience in film or entertainment and therefore would have had difficulty exercising their formal right to take over management of the

-11-

companies after they were fully organized.  *Cf. Aqua-Sonic Prods. Corp.*, 687 F.2d at 583-84

(noting that investors had no experience in selling dental products and therefore would be

unlikely to feel capable of undertaking distribution themselves);  *Bailey v. J.W.K. Props., Inc.*,

904 F.2d 918, 923-24 (4th Cir.1990) (finding that investors had "little to no control over the

ultimate success or failure" of their cattle breeding investments where they had the contractual

authority to direct the breeding but no expertise in selecting embryos or cross-breeding).  And

their number and geographic dispersion left investors particularly dependent on centralized

management.  We echo the Fifth Circuit in finding that investors may be so lacking in requisite

expertise, so numerous, or so dispersed that they become utterly dependent on centralized

management, counteracting a legal right of control.  *See Williamson v. Tucker*, 645 F.2d 404,

423-24 (5th Cir. 1981).[7]  "What matters more than the form of an investment scheme is the

'economic reality' that it represents. The question is whether an investor, as a result of the

investment agreement itself *or the factual circumstances that surround it*, is left unable to

exercise meaningful control over his investment."  *Robinson v. Glynn*, 349 F.3d 166, 170 (4th

Cir. 2003) (internal citation omitted) (emphasis added).

In sum, upon consideration of the totality of the circumstances, we conclude that the jury

could have determined that, notwithstanding the organizational documents drafted to suggest

active participation by members, the defendants sought and expected passive investors for Little

Giant and Heritage, and therefore the interests that they marketed constituted securities.

    *II.  The Jury Charges*

---

[7] The Eleventh Circuit has also adopted this ruling.  *See SEC v. Merch. Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007).

Appellants also raise a number of objections to the jury charges, only one of which merits specific discussion--the objection to the inclusion of a "no ultimate harm" charge. The district court charged the jury as follows:

> Under the anti-fraud statutes, even false representations or statements or omissions of material facts do not amount to a fraud unless it is done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the belief may turn out to be.
> In considering whether or not a defendant acted in good faith, you are instructed that a belief of a defendant, if such belief existed, that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by him.

Appellants claim that none of the defendants presented any indication that the ultimate outcome of their actions would differ from the immediate outcome of their actions, and therefore this charge risked confusing the jury into thinking that appellants could be guilty even if they believed their conduct lawful. *See United States v. Rossomando*, 144 F.3d 197, 202-03 (2d Cir. 1998) (finding no ultimate harm charge improper where defense was not that defendant thought that there would be no ultimate harm, but rather that defendant thought that there would be no harm at all).

We are of the view that there was a proper predicate for the "no ultimate harm" charge. The record provides evidence to support a finding that Dickau and Silverstein intended to deceive the investors into thinking that money would be spent on pre-production, rather than on sales commissions. Insofar as Dickau and Silverstein intended to deprive investors of the "full information" they needed to "make refined, discretionary judgments," they intended to harm the

investors, *id.* at 201 n.5; *see also United States v. Dinome*, 86 F.3d 277, 284 (2d Cir. 1996). In addition, at trial, both Dickau and Silverstein highlighted their good faith belief that the movie would be made. The focus on the completion of the movie amounted to a "no ultimate harm" argument: Even though the ISOs intended to deny the investors of information, they believed there would be no ultimate harm to investors because the movie would be produced as promised, and the investors would be no worse off for not knowing the true allocation of resources.

We have considered appellants' other arguments on appeal challenging the conviction and find them to be without merit. Any error in the jury instructions was, at most, harmless, and more than sufficient evidence supported the verdict in all other respects.

*III. Whether the District Court Erred in its Loss Calculations*

We review Guidelines sentences and non-Guidelines sentences under the same standard: reasonableness. *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). "[A] sentence may (but need not necessarily) be vacated as 'unreasonable' because some steps taken by the sentencing court in determining or imposing the sentence did not comport with the requirements of law, either substantive or procedural." *United States v. Pereira*, 465 F.3d 515, 519 (2d Cir. 2006). "An error in determining the applicable Guideline range . . . would be the type of procedural error that could render a sentence unreasonable . . . ." *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005).

Under the version of the Sentencing Guidelines applicable to the instant convictions, § 2F1.1 governed offenses involving fraud or deceit, and the total offense level was determined,

-14-

in part, as a function of the loss amount. *See* U.S.S.G. § 2F1.1 (2000).[8] An application note to

§ 2F1.1 provided guidance on calculating the loss amount:

> As in theft cases, loss is the value of the money, property, or services unlawfully taken . . . . Frequently, loss in a fraud case will be the same as in a theft case. For example, if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000.
>
> There are, however, instances where additional factors are to be considered in determining the loss or intended loss:
>
> > (a)  Fraud Involving Misrepresentation of the Value of an Item or Product Substitution
> >
> > A fraud may involve the misrepresentation of the value of an item that does have some value (in contrast to an item that is worthless). Where, for example, a defendant fraudulently represents that stock is worth $40,000 and the stock is worth only $10,000, the loss is the amount by which the stock was overvalued (*i.e.*, $30,000). In a case involving a misrepresentation concerning the quality of a consumer product, the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received.

U.S.S.G. § 2F1.1 cmt. n.8(a) (2000); *see also United States v. Stanley*, 54 F.3d 103, 106-07 (2d

Cir. 1995). The Guidelines stated that "[t]he court need only make a reasonable estimate of the

loss, given the available information." U.S.S.G. § 2F1.1 cmt. n.9 (2000). "Nevertheless, a court

of appeals must 'determine[] whether the trial court's method of calculating the amount of loss

was legally acceptable.'" *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (quoting

*United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005)) (alteration in original).

---

[8] Chapter Two, Part F of the 2000 Sentencing Guidelines was eliminated in 2001, but the substance of many of its provisions was moved to Chapter Two, Part B. *See generally United States v. Reifler*, 446 F.3d 65, 107 (2d Cir. 2006).

The district court computed the loss amount as equal to the entire cost of the securities sold by the appellants, on the ground that the members would not have invested had they realized the true size of the sales commissions. In Dickau's case, the district court also ordered restitution for the same amount.[9] Although we defer to the district court's determination that the members would not have purchased the investment had they known that 45% of the sales price went toward commissions, this does not, in and of itself, mean that the securities the investors received in exchange for their contributions were entirely without value. After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture. Accordingly, the district court erred in not deducting from the purchase price the actual value of the instruments.[10] *See United States v. Sash*, 396 F.3d 515, 522-23 (2d Cir. 2005) (Guidelines commentary is authoritative as to the meaning of the Guidelines if it interprets a Guidelines term and is in not inconsistent with the Guidelines text, the Constitution, or federal law); *cf. Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970) (employing a recissional measure of

---

[9] We note that only Dickau appears to be subject to a restitution order in the amount of gross sales and that all other restitution orders, including Silverstein's, were in the amount of undisclosed commissions. "'[A]lthough § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so,'" *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (quoting *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)), and we encourage the district court to provide some reasoned basis for any disparity in restitution calculations on resentencing.

[10] This case is distinguishable from *United States v. Marcus*, 82 F.3d 606 (4th Cir. 1996), in which the Fourth Circuit approved a "gross sales" measure of damages in a case involving generic drugs that were not made according to the formula approved by the Food and Drug Administration. Whereas here there was evidence that the individual investors would not have purchased the units had they known the true commission rates, the district court in *Marcus* had determined that "consumers would not purchase a drug of unknown safety and efficacy at any price," *id.* at 610,--*i.e.*, the drugs were worthless. *See also United States v. Bhutani*, 266 F.3d 661, 668-69 (7th Cir. 2001).

-16-

damages, rather than equating damages to purchase price, where "the evil is not the price at which Chasins bought but the fact of being induced to buy and invest").[11]

We are mindful that illiquid securities for which there is no public market can be extremely difficult to value. Determination of the extent to which the misrepresentations here resulted in an overvaluation of the securities "cannot be an exact science," *Rutkoske*, 506 F.3d at 179, and we can only call on the district court to make a "reasonable estimate" of the loss amount, U.S.S.G. § 2F1.1 cmt. n.9 (2000). The reasonable valuation of such illiquid assets is an exercise best committed to the sound discretion of the district court.

## CONCLUSION

For the reasons set forth above, we AFFIRM the convictions, VACATE the sentences, and REMAND to the district court for resentencing consistent with this opinion.

---

[11] As we explained in *Rutkoske*, the district court may look to principles governing recovery of damages in civil securities fraud cases for guidance in calculating the loss amount for purposes of the Guidelines. 506 F.3d at 179.